RISHI BHANDARI (SBN 226055)
rb@mandelbhandari.com
**MANDEL BHANDARI LLP**
80 Pine Street, 30th Floor
New York, NY 10007
Telephone: (212) 269-5600
Facsimile: (646) 964-6667

*Attorneys for Plaintiff Bonnie Verburg*

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

### LOS ANGELES DIVISION

| | |
|---|---|
| BONNIE VERBURG, | Case No. 19-cv-7966 |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| SCHOLASTIC INC, | |
| Defendant. | |

Plaintiff Bonnie Verburg ("Plaintiff"), a former employee who was systematically discriminated against by Defendant Scholastic Inc. ("Defendant" or "Scholastic") alleges as follows:

**NATURE OF THE CASE**

1. As the world's largest publisher of children's books, Defendant Scholastic has been teaching the youth of America how to treat each other with respect and decency for almost one hundred years. Countless individuals, young and old, base their internal sense of right and wrong on the moral messages internalized from books Scholastic publishes or distributes.

2. Unfortunately, Scholastic does not practice the lessons that grace the pages of so many of its wonderful books. It pays its female workers less than their similarly situated male counterparts and culls older employees, actively seeking to put "somebody younger" in their place and telling those that remain that "[a]t your age, you're lucky to have a job."

3. Plaintiff Bonnie Verburg was a Vice President and Editorial Director at Scholastic who worked for the company for more than twenty-five years. During her tenure, she was responsible for acquiring and editing hundreds of titles that have sold over 250 million books.

4. Verburg was the founder and Editorial Director for Blue Sky Press, the Scholastic imprint that published THE ADVENTURES OF CAPTAIN UNDERPANTS – after Verburg lobbied hard to sign Dav Pilkey as an author.

5. Books edited by Verburg have won Newbery and Caldecott Honors and inspired millions of children to read.

6. But, as she grew older, Verburg was subject to an ever-increasing chorus of slurs about her age. She was chided for acting "like an old person," and told that the company "wants the more younger people here. [sic]" While discussing promotion strategies for Ms. Verburg's popular "How Do Dinosaurs..." series, Verburg was told that she could pose as the "grandmother of a dinosaur."

7. In comment after comment from executive after executive, Scholastic made clear to Verburg that the company wanted to "get somebody younger and more dynamic" in her place and that "[a]t your age, you're lucky to have a job." Over time, responsibilities were taken from Verburg and assigned to younger workers who were seen as more "dynamic" and less "outdated." Those younger workers were also given larger travel and entertainment budgets to promote their books.

2

They were also paid bonuses when their books received awards – bonuses that were not paid to Verburg when her books won identical honors.

8.     Finally, Scholastic decided that slurs and harassment were not enough.  On April 10, 2019, the CEO of Scholastic, Richard Robinson, summoned Verburg to his private conference room. There he told her that she was being fired.  Despite more than a quarter century of exemplary contributions to the business, Verburg was given absolutely no reason why she was losing her job. But when Verburg asked whether Scholastic was terminating any other employees, Robinson quickly admitted that the company had also decided to terminate other older employees.

9.     Verburg was terminated on June 1, 2019.

10.     After Verburg was terminated, she then discovered a dark secret about her job. Verburg learned that her male colleagues, people who had identical jobs to hers, had for decades been paid hundreds of thousands of dollars more per year than she was.  As a policy, Scholastic systematically underpays its female workers, giving them less in each and every paycheck for the same work performed by men.

11.      Verburg now brings her Equal Pay Act claims under the Equal Pay Act of 1963 and related California statutes, seeking to hold Scholastic accountable for its years of discriminatory behavior.

12.     The statute of limitations on Equal Pay Act claims is just three years but, upon information and belief, Verburg was discriminated against for over 20 years.

13.     For example, Ken Geist, whose title is also Vice President, Editorial Director, earns far more than Verburg.  Geist and Verburg were both the heads of their own imprints at Scholastic and had the exact same title.  They both reported to the same supervisor in the New York office:  Ellie Berger.

14.     The difference in pay between Geist and Verburg was not due to seniority, because Verburg started in 1992 and Geist started in 2001.

15.     As it turns out, in 2001, when Geist was hired, he was paid over $250,000 and Verburg was paid less than $190,000.

16.     The difference in pay between Geist and Verburg was also not due to merit, quantity, or quality of production because, in 2001, when Geist was hired, Verburg had, among other things, acquired THE ADVENTURES OF CAPTAIN UNDERPANTS and was the editor of two books that had received back-to-back Caldecott Honors.  NO, DAVID! received the honor in 1999 and WHEN SOPHIE GETS ANGRY received the honor in 2000.

17.     Geist was paid more even though he had accomplished far less in his career.  But he was a man.  And Scholastic pays men more – even when they accomplish less than similarly situated women.

18.     Predictably, Geist and Verburg's pay differential compounded over time.  By 2018, Geist earned over $380,000 per year but Verburg's 2018 salary was just $193,950.

19.     Similarly, Arthur Levine, David Saylor, Barry Cunnigham, and David Levithan, are other Scholastic employees who had jobs that were very similar to Verburg and/or shared a title with Verburg.  Upon information and belief, each of these male employees earned between $100,000 to $300,000 more per year than Verburg made.

20.     Prior to filing this lawsuit, Verburg asked Scholastic to share salary information for these male employees but Scholastic refused.

21.     There can be no performance-based explanation for the pay difference between these men and Verburg because: (i) they all started at higher salaries than Verburg started at; and (ii) they made more money than Verburg every year, regardless of merit, quantity, or quality of production.

22.     Perhaps hoping to avoid scrutiny for its unlawful behavior, Scholastic tried to get Verburg to sign a Separation Agreement releasing her claims against Scholastic.  However, in order to induce Verburg to sign the Separation Agreement, Scholastic violated California and federal law by refusing to pay Verburg the separation pay that she was entitled to or for unused vacation days unless she signed a release of all claims against Scholastic.

23.     After learning that she had been systematically underpaid for decades simply because she was a woman, Verburg refused to sign the release and filed this lawsuit for Scholastic's willful violation of the laws requiring men and women to be paid the same amount for substantially similar work.

24.     Verburg's other claims against Scholastic (for age discrimination and violation of various California Labor Law statutes) require that she file complaints with various administrative agencies before bringing suit.  Consequently, Verburg will either amend this complaint or file separate complaints as soon as she receives right-to-sue letters from the necessary administrative agencies.

## THE PARTIES

25.     Plaintiff Bonnie Verburg is an individual residing in Los Angeles, California.

26.     Defendant Scholastic Inc. is a corporation organized under the laws of New York with its principle place of business at 557 Broadway, New York, New York 10012.

27.     Defendant Scholastic Inc. is registered to do business as a foreign corporation in California, with the California Corporate Number C0481213.

## JURISDICTION AND VENUE

28.     The Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a)(1), as it involves claims arising under federal statutes, specifically The Equal Pay Act of 1963, 28 U.S.C. §§ 1331.

29.     The Court has supplemental jurisdiction over the claims arising from state law pursuant to 28 U.S.C. § 1367.

30.     In addition, this Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that (a) Plaintiff is a resident of California and Defendant is a resident of New York, and (b) the matter in controversy exceeds $75,000, exclusive of interest and costs.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f) because (i) all natural person Defendants reside in this district; and (ii) a substantial part of the events underlying this action occurred in this District.

## FACTS

**A.     Background**

32.     Scholastic is the world's largest publisher and distributor of children's books, with revenues of $1.65 billion in 2018.  With offices in more than thirteen countries, Scholastic publishes one out of every two children's books sold in the United States.

33.     Scholastic distributes many widely known children's and young adult books, such as the HARRY POTTER series, the DIARY OF A WIMPY KID series, and dozens of perennial classics such as THE GIVING TREE, GOODNIGHT MOON, and BROWN BEAR BROWN BEAR WHAT DO YOU SEE?.

34.     Verburg worked at Scholastic from 1992 until June 1, 2019, serving as a Vice President and Editorial Director.

35.     During her quarter century at Scholastic, Verburg was responsible for acquiring, developing, editing, and shaping the books and careers of many of the company's most celebrated authors, including such blockbuster titles/series as THE ADVENTURES OF CAPTAIN UNDERPANTS by Dav Pilkey; HOW DO DINOSAURS SAY GOOD NIGHT? by Jane Yolen;  and NO, DAVID! by David Shannon.

36.     Books published and distributed under Verburg's supervision have earned the highest honors in children's publishing, including the coveted Newbery and Caldecott Honors.

37.     Verburg also built Scholastic's trade division into a major player, attracting top editors such as Arthur Levine, who acquired the U.S. rights to the HARRY POTTER series.  Verburg's work transformed the Trade Book Group and built the economic backbone for Scholastic's financial performance.

38.     In her time at Scholastic, Verburg never received a negative performance review.

39.     Indeed, Verburg's supervisors and colleagues were inspired by her exceptional talents and drive to bring high quality books to children in the United States and abroad.  Verburg's books have performed extraordinarily well in markets such as China and South Korea, which have experienced enormous growth over the past decade.

40.     Verburg was passionate about her work.   On her LinkedIn page, she described her job as follows:

> I have the happiest career in the entire world! Publishing children's books is like waking up every day as president of the Optimism Club. Truly there are no words that express my gratitude. I had the incredible gift of founding The Blue Sky Press in 1992 and launched it in Fall 1993 with books by Newbery Medalists Virginia Hamilton, Cynthia Rylant, and Nancy Willard along with Caldecott Medalists Leo & Diane Dillon and National Book Award-winner Barry Moser--and a writer new to children's books: Rodman Philbrick, with his now-classic FREAK THE MIGHTY. Do you believe in miracles? I do! That was 26 years ago. From acquiring THE ADVENTURES OF CAPTAIN UNDERPANTS to HOW DO DINOSAURS

SAY GOOD NIGHT?, many, many books later, our winged heart continues to thrive.

41.     As of 2019, Verburg was continuing to perform at the highest levels.

42.     Verburg's Fall 2019 list included two-time Caldecott Medalists Leo & Diane Dillon's LOVE AND THE ROCKING CHAIR (which was already cited in School Library Journal's "Spotlight" as a contender for 2020's Caldecott Medal).  Verburg was also publishing WILDFIRE, a new novel by Newbery Honor Author Rodman Philbrick.  In addition, Verburg's Fall 2019 list also included board book versions of two very popular picture books:  HOW DO DINOSAURS SAY MERRY CHRISTMAS? and HOW DO DINOSAURS SAY HAPPY CHANUKAH?

43.     Indeed, after Ms. Verburg turned around eight drafts of WILDFIRE, Scholastic's Book Fairs Division ordered 200,000 copies of the book in anticipation of heavy demand.  The Division has also created posters, a promotional video, and shelf headers for the entire school year.  They distributed 14,000 paperbacks to their top accounts and made plans to send the author on tour.

44.     Scholastic's Book Clubs Division concurred  with Book Fairs' assessment of WILDFIRE and seeded its market by sending 6,500 bound galleys of WILDFIRE to top teachers.  The Division intends to offer WILDFIRE this Fall in its most profitable months: September, October, and November.

**B.     Scholastic Discriminates Against Verburg**

45.     Ms. Verburg is 64 years old.

46.     As Verburg grew older, Verburg's supervisors and other Scholastic executives began to regularly make disparaging comments that revolved around her age and expressed a clear desire that the company employ younger employees.

47.     Ellie Berger, Scholastic's Trade Books Group President and Verburg's direct supervisor made numerous disparaging comments about Verburg's age.  For example, on July 31, 2017, Berger and Verburg were discussing whether to acquire WILDFIRE, the book from Rodman Philbrick, who is also in his late sixties.  Ms. Berger dismissed Verburg's ideas, telling her that she was just acting "like an old person," and that both Verburg and Philbrick were "outdated."

48.   Nor was Berger's animus confined to her comments.  Berger also gave similarly situated younger editors larger travel and entertainment budgets than she gave to Verburg.  Because Berger believes that younger editors are more valuable than older editors, she reasoned that it made the most sense to allocate more resources towards younger editors.

49.   When older editors succeeded in spite of this treatment, Berger would nevertheless work to undermine them and reassign their successful projects to younger employees.

50.   For example, in 2017, Scholastic decided to redesign Verburg's popular easy-reader series called POPPLETON and to add two additional books that Verburg had already acquired.

51.   Without consulting Verburg, Scholastic changed imprints and assigned a much younger employee to edit the new books.

52.   This unexplained change was so disturbing that the series illustrator, Mark Teague, questioned Verburg about it.  She was given no explanation by Scholastic to offer him.

53.   Similarly, in 2018, Verburg proposed that Scholastic publish a book about a dog that is rescued and then himself becomes a rescue dog.  The dog would then locate people trapped by earthquakes and other disasters, leading to a series.

54.   Berger and the Scholastic Acquisitions Group initially rejected the proposal.  But months later a younger editor was given permission to acquire a nearly identical book/series with the series title RESCUE DOGS.

55.   Scholastic's senior managers have been aware of Berger's animus towards older employees for a long time.

56.   For years, Berger has been close with Lizette Serrano, Executive Director, Educational Marketing and Event Strategy.

57.   On March 8, 2017, Serrano and Verburg discussed staff layoffs.  In that conversation, Serrano told Verburg that "Ellie [Berger] wants the more younger people here."

58.   The company's support for Berger's discriminatory treatment of older employees caused other employees to engage in this same misconduct.

59.     For example, on February 16, 2017, Verburg had a conversation with Ken Geist, another book editor, about Scholastic's relationship with Jane Yolen and Mark Teague, who are a highly regarded author and illustrator, respectively.

60.     In that conversation, Geist told Verburg point blank, "At your age, you're lucky to have a job."

61.     Similarly, on October 10, 2016, while discussing promotion strategies for the twentieth anniversary of Verburg's popular "HOW DO DINOSAURS..." series, Geist told Verburg that she could pose as the grandmother of a dinosaur.

62.     Numerous other Scholastic executives made similar disparaging comments.   For example, on September 25, 2014, while discussing possible staff changes, David Saylor, a senior executive in the Graphix Imprint, told Verburg that Scholastic needed to "get somebody younger and more dynamic."

**C.      Scholastic Fires Verburg**

63.     On April 10, 2019, Verburg was summoned to a meeting with Scholastic's CEO, Richard Robinson in his private conference room.

64.     At the meeting Robinson told Verburg that she was fired.

65.     Prior to the April 10, 2019 meeting Verburg had never had a negative performance review.

66.     Prior to the April 10, 2019 meeting Verburg had never been told that her job performance was inadequate or that her job was in jeopardy.

67.     Distraught at suddenly losing a job where she had performed outstanding work for over a quarter of a century, Verburg asked why she was being terminated and whether anyone else was being let go.

68.     They say that a gaffe is when a politician accidentally tells the truth.  Sometimes this happens to business executives as well.

69.     In response to Verburg's question, Robinson admitted that the company decided to terminate a number of older employees with long service to the company, including herself.

70.    Robinson admitted that age and length experience were factors in Scholastic's decision to fire Verburg and others.

71.    In fact, Robinson had nothing but compliments about Verburg's contributions to the company.

72.    At the time she was terminated, Verburg had numerous accrued vacation days.

73.    But Scholastic refused to timely pay Verburg for her accrued vacation days unless she agreed to release all claims against the company.

74.    Ultimately Scholastic paid Verburg for some – but not all – of the vacation days to which she was entitled.

75.    Scholastic has a policy of paying terminated employees two weeks of severance pay for each year of service.

76.    But Scholastic also refused to pay Verburg any severance unless she agreed to release all claims against the company.

**D.    Scholastic Systematically Underpays Its Female Employees**

77.    After she was fired, Verburg then discovered that she had been paid far, far less than her male colleagues.

78.    For example, in 2001, when Geist was first hired, he was paid over $250,000 and Verburg was paid less than $190,000.

79.    In 2009, Verburg's base salary was still less than $190,000.

80.    In contrast, Ken Geist, who had exactly the same job title as Verburg's, had a base compensation in 2009 of approximately $350,000.

81.    This disparity compounded over time.  At the time that Verburg was fired, she was earning a base salary of $193,950.  Geist was earning in excess of $385,000 per year.

82.    Geist and Verburg were both the heads of their own imprints at Scholastic and had the exact same title.  They both reported to Ellie Berger in the New York office.

83.    There was no *bona fide* reason for the pay disparity between Geist and Verburg.

84.     Arthur Levine, David Saylor, Barry Cunnigham, and David Levithan are other Scholastic employees who had jobs that were substantially similar to Ms. Verburg and/or shared a title with Ms. Verburg.

85.     Each of these male employees earned between $100,000 to $300,000 more per year than Verburg made during the same time periods.

**E.      Private Attorney General Act ("PAGA") Allegations**

86.     Scholastic has violated Plaintiff's and current and former employees' rights under the California Labor Code, including the California Equal Pay Act, Section 1197.5.

87.     Plaintiff seeks to represent and to recover civil penalties on behalf of herself and other Similarly Aggrieved Current and Former Employees, who worked in California at any time on or after a date one year prior to the filing of Plaintiff's Labor and Workforce Development Agency Notice.

88.     For example, it is unlawful to pay women less than men.

89.     Scholastic violated that law.

90.     It is also unlawful to force an employee to sign a release before paying the employee for unused vacation days.

91.     Scholastic violated that law.

92.     It is also unlawful for Scholastic to refuse to pay its employees for unused vacation days from previous years.

93.     Verburg had many weeks of used vacation days that Scholastic refused to pay Verburg for.

94.     These violations are continuing and ongoing. On behalf of herself and other Similarly Aggrieved Current and Former Employees, Plaintiff will seek civil penalties for Scholatic's violations of the California Labor Code.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATION OF THE EQUAL PAY ACT OF 1963
### GENDER DISCRIMINATION
### 29 U.S.C. §§ 206 et seq.

95.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

96.     Defendant has discriminated against Plaintiff in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.*, as amended by the Equal Pay Act of 1963 ("EPA").  Defendant has paid Plaintiff less than similarly-situated male colleagues performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

97.     Defendant has subjected Plaintiff to discriminatory pay policies, including: a discriminatory system of determining salaries and other compensation incentives, which resulted in Plaintiff performing the same tasks receiving different compensation; and other forms of discrimination affecting pay.

98.     The differential in pay between male and female workers was not due to seniority, merit, quantity, or quality of production, but was due to gender.

99.     Defendant has caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA.  Moreover, the foregoing conduct constitutes a willful violation of the EPA within the meaning of 29 U.S.C. § 255(a).  Because Defendant has willfully violated the EPA, a three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

100.     As a result of Defendant's conduct alleged in this Complaint, Plaintiff has suffered and will continue to suffer harm, including but not limited to: lost earnings, lost benefits, and other financial loss, as well as non-economic damages.

101.     By reason of Defendant's discrimination, Plaintiff is entitled to all legal and equitable remedies available for violations of the EPA including liquidated damages for all willful violations,

prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b). Attorneys' fees should be awarded under 29 U.S.C. § 216(b).

**COUNT TWO**
**VIOLATION OF THE CALIFORNIA EQUAL PAY ACT**
**Cal. Lab. Code § 1197.5, *et seq.***

102.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

103.    Defendant has discriminated against the Plaintiff in violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5, *et seq.*  Defendant has paid Plaintiff less than similarly-situated male employees in the same establishment performing equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

104.    Defendant has subjected Plaintiff to common discriminatory pay policies, including: a discriminatory system of determining salaries and other compensation incentives.

105.    The differential in pay between male and female employees was not due to seniority, merit, the quantity or quality of production, or a *bona fide* factor other than sex, such as education, training, or experience, but was due to gender. In the alternative, to the extent that Defendant relied upon one or more of these factors, said factor(s) were not reasonably applied and did/do not account for the entire wage differential.

106.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex.  Moreover, the foregoing conduct constitutes a willful violation of the California Equal Pay Act, Cal. Lab. Code § 1197.5, *et seq.*  Therefore, a three-year statute of limitations applies to such violations, pursuant to California Equal Pay Act, Cal. Lab. Code § 1197.5(h) *et seq.*, and California Equal Pay Act, as amended by the California Fair Pay Act, Cal. Lab. Code § 1197.5(h).

107.    As a result of Defendant's conduct alleged in this Complaint and/or Defendant's willful, knowing, and intentional discrimination, the Plaintiff has suffered and will continue to suffer

13

harm, including but not limited to lost earnings, lost benefits, and other financial losses, as well as non-economic damages.

108.   The Plaintiff is therefore entitled to all legal and equitable remedies, including doubled compensatory awards for all willful violations.

109.   Attorneys' fees should be awarded under California Labor Code § 1197.5(g).

**COUNT THREE**
**UNFAIR COMPETITION**
**California Business and Professions Code § 17200** *et seq.*

110.   Plaintiff re-alleges and incorporates by reference each and every allegation in each and every preceding paragraph as if fully set forth herein.

111.   Defendant is a "person" as defined under California Business & Professions Code § 17021.

112.   Defendant's willful failure to pay female employees equally and to otherwise offer female workers equal employment opportunities as alleged above, constitutes unlawful, unfair, and/or fraudulent activity prohibited by California Business and Professions Code §17200.

113.   Defendant refused to pay Plaintiff compensation that she had earned without Plaintiff releasing all of her claims against Defendant.

114.   As a result of their unlawful, unfair, and/or fraudulent acts, Defendant reaped and continue to reap unfair benefits and illegal profits at the expense of Plaintiff.  Defendant should be enjoined from this activity.

115.   Accordingly, Plaintiff is entitled to restitution with interest and other equitable relief, pursuant to Cal. Bus. & Prof. Code §17203.

**PRAYER FOR RELIEF**

Wherefore, Bonnie Verburg prays for judgment and relief as follows:

A.   Issue a permanent injunction against Scholastic and Scholastic's officers, trustees, owners, employees, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any conduct violating the rights of the Plaintiff, as secured by the Equal Pay Act and/or California law, and

14

order such injunctive relief as will prevent Scholastic from continuing its discriminatory practices and from engaging in any further unlawful practices, policies, customs, usages, and gender discrimination as set forth herein;

B.    Award back pay, front pay, lost benefits, preferential rights to jobs, and other damages for lost compensation and job benefits suffered by the Plaintiff, in an amount not less than $5,000,000;

C.    Award nominal, liquidated, and compensatory damages to Plaintiff, in an amount not less than $5,000,000;

D.    Award punitive damages to Plaintiff;

E.    Award civil and statutory penalties available under applicable laws, including waiting time penalties;

F.    Order Scholastic to make whole the Plaintiff by providing her with any other monetary and affirmative relief;

G.    Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to the Plaintiff;

H.    Award Plaintiff all pre-judgment interest and post-judgment interest available under law;

I.    Award Plaintiff any other appropriate equitable relief, including reinstatement;

J.    Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Scholastic has remedied the practices complained of herein and is determined to be in full compliance with the law; and

K.    Award additional and further relief as this Court may deem just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury on all issues triable of right by jury.

**DATED:**      New York, New York
              September 13, 2019

_____
Rishi Bhandari

MANDEL BHANDARI LLP
Rishi Bhandari (CA Bar No.226055)
Robert Glunt (*pro hac vice forthcoming*)
80 Pine Street, 33rd Floor
New York, NY 10005
T:  (212) 269-5600
F:  (646) 964-6667
rb@mandelbhandari.com

*Attorneys for Plaintiff Bonnie Verburg*

16